The first case for argument this morning is Sifuentes v. Brazelton. Before calling on counsel, I would like to express the appreciation of Judge Ikuda and myself to our visiting judge, Judge Halberg, from the District of Arizona. We appreciate your willingness to help us out. Thank you, Judge. Counsel, you may proceed. Thank you, Your Honor. John Deist for the warden. If I may say at the outset, I have bad hearing. I'm using this device, but it only works when people speak into the microphone. And so if I'm leaning forward, you'll understand that I'm not hearing well. Very well. The issue in this case is whether the prosecutor violated Batson by dismissing nine out of 12 black prospective jurors. The trial judge had no difficulty in finding that the prosecutor's challenges to all of the jurors were both race-neutral and sincere. The court of appeal unanimously affirmed without expressing any difficulty or hesitation on federal habeas. For a co-defendant, Judge Alsop found that no reasonable jurist could disagree with the state courts, and so he denied that defendant a certificate of appealability after denying the Batson claim. Judge Hamilton disagreed. She agreed that seven of the prosecutor's challenges were race-neutral and reasonable. She thought two challenges were discriminatory, and so I'd like to focus on those jurors, Mr. Thompson and Ms. Gibson. Mr. Thompson was a Baptist minister, and Ms. Gibson was a born-again Christian. I think that any prosecutor, upon hearing those characteristics, would immediately be concerned. This was a death penalty case. Two of the defendants were non-shooters. The defendants were youthful. The prosecutor could be concerned that a Baptist minister whose religion taught him not to judge people might not be able to personally impose the death penalty. Could I interrupt for a moment? Can you hear me all right? I just want to make sure that we're looking at the correct standard here, because this is a habeas, so we're in AEDPA land. Is that right? Right. So what we're trying to determine is whether the State appellate court here made an objectively unreasonable determination of the facts in upholding the trial court's determination that the prosecutor's strikes were not pretextual. Is that right? Well, I think we're evaluating the State court judgment as a whole, so we start with the trial court's decision. The State court applied one level of deference, the standard Batson deference, to determine whether the strikes were discriminatory. So under AEDPA, we're looking at the last reason decision, is that correct? That's right. And that's the State appellate court's determination? That's right. That's right. Okay. And this is because it's ultimately a credibility determination of whether the prosecutor was credible, is that right? So it's a factual determination? That's right. So we're under, we're looking at 2254 D-2? Well, all parties have agreed that it's D-2. There is some authority, I have a footnote in my brief suggesting that the Supreme Court has come close to Section E-1, but it seems that the cases have focused on D-2. And so ultimately I do think that in any Batson analysis, we're looking at what happened in the courtroom, what did the trial judge think of the prosecutor's reasons, what did the courtroom atmospherics reflect, the jurors' pauses and so on. And so we've got to give deference to that. Then AEDPA, of course, gives an additional layer of deference. And so in a sense, we're looking at deference to factual findings, but also legal conclusions by the court of appeal. So we need to determine if the State appellate court was objectively unreasonable in thinking the trial court's determination was valid. That's right. Was the appellate court objectively unreasonable in finding that the trial court was reasonable? So we're not reviewing the trial court's determination in the first instance. We're looking at the State appellate court's determination. That's right. Okay. I just wanted to make sure I understood what our standard of review was here. Right. But there are layers and layers of deference here. And so at a certain point, after the two layers, I kind of lose track of how much  We're guaranteed that we have to have two layers of deference. And if the trial court made an express factual statement, which I'll get to in a minute, I think deference has to be given to the trial court's observations. So this is a double deference case under AEDPA as you look at it. Everyone agrees to that. Very well. With Mr. Thompson, as I said, a Baptist minister, and the prosecutor heard that he his faith taught him not to judge people. The prosecutor pressed Mr. Thompson on that. And Mr. Thompson repeatedly said, I can impose the death penalty. I can obey the law. And the prosecutor said, but can you personally vote for the death penalty? Here we've got two youthful non-shooters. And Mr. Thompson repeatedly said, I can obey the law. Ultimately, the prosecutor challenged Mr. Thompson for cause. The trial judge said, no, I'm not going to grant that, because Mr. Thompson said, in the abstract, he can impose the death penalty. And then the trial judge said, I don't know how hot he is for the death penalty for non-shooters, but he can impose it in the abstract. I think that's about as close as we have to a factual finding that Mr. Thompson was not hot for the death penalty for non-shooters. And I think that has to be respected. Additionally, the prosecutor, when exercising his peremptory challenge, repeatedly said, it was so obvious that Mr. Thompson could not impose the death penalty on non-shooters. It was so obvious. After that explanation, the trial court said to the six defense attorneys, any comment? The court had previously foreclosed rebuttal, but the court here specifically invited rebuttal. Six capital qualified defense attorneys sat silent. I can't imagine that if the prosecutor had distorted the record and misrepresented Mr. Thompson's statement, I think those attorneys would have been up saying, we heard what Mr. Thompson said. He was perfectly open to the death penalty, but nobody said a word. The defense attorneys didn't even make an argument in their Batson motion. They simply said, it looks like the prosecutor is challenging a disproportionate number of black candidates. So opposing counsel points to other evidence in the record. For example, the jury questionnaire said he was moderately in favor of the death penalty. He voted to retain the death penalty. And he did say he would be able to impose it. What do we do with that evidence? We simply look at it. We accept it. And there's no question. Many jurors in a capital case will say, yes, I can impose the death penalty. And when we get to voir dire, the lawyers test the strength of those convictions. And jurors give conflicting answers. And there's no question. Some of the jurors expressed some hesitation. I'd like to make one quick factual correction. In my brief in the excerpts of record, at 369 to 371, those pages are labeled alternate juror number two, but they actually refer to alternate number one. 369 to 371. And alternate juror number one did say at one point, I'm not sure if I can impose the death penalty on a shooter. But that juror also said certain things like, yes, I think I can do it. And so these jurors are giving conflicting responses. When you get to after the Witherspoon, the Wainwright v. Witt challenges in a capital trial, when all jurors who are inflexibly opposed to the death penalty or inflexibly in favor of it, after those jurors are dismissed for cause, you have a whole pool of jurors who say I can impose the death penalty or LWOP, depending on the circumstances. And so there are always going to be people who make comments, well, maybe there might be some circumstances where I wouldn't impose the death penalty. That's where the prosecutor and the trial the prosecutor has to make a judgment. He explains his reason to the trial judge, and the trial judge makes a credibility finding. And the trial court here said, I have no problem here. And again, the defense attorneys did not protest. Now, that's with respect to Mr. Thompson. What about Ms. Gibson? Ms. Gibson, several reasons. She was a born-again Christian. She had several relatives with criminal convictions, her son, her brother, cousins, and brothers-in-law. Prosecutors routinely dismiss such jurors. Ms. Gibson was a lawyer. She was not currently practicing as a licensed attorney, but she was a law school graduate, a member of the bar. She did regulatory work for SBC-PACBEL. That's lawyers' work. And so the district court acknowledged that the her legal education, her relatives with criminal histories could be, was not pretextual. But the district court was concerned about two reasons that were pretextual based on her Christian beliefs, because she did say she could — they permitted her to consider the death penalty, and also that she had worked as a teacher. So could you address those two reasons that the district court focused on? Sure. The prosecutor cited her Christian beliefs. And it is true. Ms. Gibson said, I used to oppose the death penalty, but now I favor it because I've become a born-again Christian. And all of the lawyers, two of the defense attorneys and the prosecutor, questioned her at length, because that's somewhat counterintuitive. One would think that if a person becomes a born-again Christian, her opinions on the death penalty might change from favoritism towards opposition. But the prosecutor questioned Ms. Gibson at length, and he said she initially opposed the death penalty, but then she became a born-again Christian. Now, he didn't specifically say her born-again Christian beliefs prevented her from imposing the death penalty. And Ms. Gibson said, yes, I can do it. But I think the prosecutor was entitled to be concerned, wondering, would a born-again Christian be willing to impose the death penalty on a 19-year-old defendant who wasn't the killer? What if in the penalty phase of trial, the defendant, Cifuentes, took the witness stand and said, I did a stupid and a terrible thing, and since I've been in jail, I've read the Bible, I've come to accept Christ as my Savior, and I hope to live the rest of my life preaching the gospel to fellow inmates in prison? I think a born-again Christian would be highly likely to believe in redemption and grant Elwap instead of death to that person. With respect to the teacher, I think that characteristic is relatively minor. The prosecutor did not dwell on it. He said he doesn't like teachers. She was a substitute teacher for three years, not a major factor in his analysis. But if that was a factor, he listed it and he moved on. But I think the fact that the prosecutor specifically said, I'm concerned about people with criminal, with relatives with criminal backgrounds. I don't like lawyers. They inject themselves into the proceeding. They second-guess. They're know-it-alls. Well, a woman who had applied to the neighboring county, Alameda County District Attorney's Office, like Ms. Gibson had done so, and had been rejected for that position, had gone to work for Pac-Bell, such a juror might look at the prosecutor. If he doesn't like lawyers who might second-guess him, a lawyer like Ms. Gibson might be unattractive to him. So several reasons. The prosecutor had accepted other teachers, though. He did. He did. And, Judge, I do think the characteristic of teacher is not like the characteristic of strong opposition to the death penalty. You could have a teacher who comes in and says, I teach military history at the local college. I'm retired U.S. Marine. I've got six police officers in my family. I'm very strongly law and order. A prosecutor might say, well, I generally don't like teachers, but I'll take this one. I think teacher, again, the prosecutor did not dwell on it. And I think that was an error of Judge Hamilton's. If the prosecutor did not, if his reasons did not match perfectly across the board, Judge Hamilton seemed to find pretext. And the principle of Batson and AEDPA is that we grant deference. If the prosecutor could reasonably act as he did, then we assume there's no pretext. Counsel, you're down to less than two minutes if you wish to reserve. I'll reserve that time, Your Honor. May do so. Thank you. We'll hear from the appellee. Good morning, Your Honors. Donald Horgan here on behalf of Appellee Miguel Cifuentes. As the Court knows, and as the Supreme Court said in Batson, a peremptory strike that's based on discrimination, pretextual reason, has an utterly corrosive effect on the fairness of any trial. In this case, Judge Hamilton understood both what her obligation was under AEDPA. She understood the levels of deference that were at play. She understood the applicable Batson principles for locating a pretextual strike. Notably, and I think, Judge Akuta, you brought up what we're looking at here under AEDPA, we are looking at the decision of the California Court of Appeal. And, yes, there is ordinarily deference accorded to such dispositions on a factual question like this one. But this Court has also recognized in Taylor v. Maddox that a state court disposition on a factual question can be unreasonable under 2254 D.2, where that court has before it evidence that supports a petitioner's claim and appears to disregard it, or if that court misconstrues the evidence in an objectively unreasonable way. That's precisely what happened here with Marcus Thompson. The state appellate court, like the prosecutor, seized on the fact that Mr. Thompson was religious, was a minister, and the state court stated that he had expressed extreme reservations towards the death penalty. I'm sorry if I'm a little too close here. It's getting a little loud, sorry. That simply cannot be squared with the colloquy with Marcus Thompson. Marcus Thompson explained repeatedly to the prosecutor and to the court that while he was religious and believed he had to, he had a duty to follow his religion and couldn't morally judge people, he absolutely could follow the law. And the law in this instance is that someone who qualifies for the death penalty if the special circumstance is found, a juror must weigh whether or not the death penalty is appropriate. So the prosecutor seemed concerned that the Mr. Thompson repeatedly said not that he would impose the death penalty, but that he could obey the law of the land or words to that effect. And because of the way the death penalty is imposed and the weighing of aggravating and mitigating factors, there isn't a legal requirement to impose the death penalty. So that was what the prosecutor was focused on, and the appellate court, the state appellate court characterized that as equivocal responses, I think, or words to that effect. So we would have to say that the state appellate court's determination that the prosecutor that the trial court didn't err in saying that the prosecutor was credible was objectively unreasonable. And I'm having trouble seeing how we get there. So help me understand that. I just think that that flies in the face of the juror's responses, Your Honor. He said the essence of what everything that Marcus Thompson said was an affirmation that he would keep an open mind as to all the evidence. He was also asked significantly by the trial court, do you have any feelings about the death penalty on the one hand or life without parole on the other that would prevent you from imposing either one or choosing between either one? No, no such feelings. So he gave every assurance he could, and the prosecutor kept after him over and over again. But all that came of that colloquy was that this juror wanted to have an open mind. And incidentally, under the law, under California law, when you get to the penalty weighting the death penalty situation, the law says you must weigh these factors. You have aggravating factors. You have mitigating factors. His assurance that he would follow the law meant that he would weigh those factors. But he also said, did he not, that he didn't like to judge, that this was a gray line area? When he said, Your Honor, when he said I don't like to judge, he explained, and Judge Hamilton's order makes this abundantly clear, what he explained was I can't morally judge somebody. I can't say they are inherently a bad person because they did something that they should never have done in the first instance. But on the other hand he didn't actually say that. That was your extrapolation, the district court's extrapolation. Actually, Your Honor, I think if you read closely what the juror said, he said I can't say you're a bad person if you've done such a thing, but that doesn't prevent me from following the laws of the land. From following the law of the land. Right. That's the language the prosecutor was concerned about. But you're saying that it was, that it really can only be interpreted as he would apply the death penalty in, or he would keep an open mind. You're saying that's the only interpretation? Throughout these, yes, Your Honor. I'm saying that if you look at the entirety of this colloquy, that is the only reasonable conclusion one can draw from this. There was an additional, the statement about a non-shooter being eligible or not. He came, if that response is read in its entirety, he makes quite clear if the circumstances, again, warrant it, I am absolutely open to imposing. It all depends on what the evidence, how the evidence preponderates in his words. What he was assuring the Court was that he's having an open mind. Let me just then move to the question of a comparative analysis, because this brings up an important point. In the comparative analysis that Judge Hamilton did, first she found, as the Court noted, that there were at least six seated jurors who wrote on their questionnaires neutral on the death penalty. He was moderately in favor. So that's a significance difference there. In addition, there was the, Judge O'Scanlan just asked about the gray line area. That was a question asking about could you impose this penalty, looked at in the abstract. And he said, well, that's a gray line area. It would depend on the evidence and the circumstances. And he came around to saying that almost immediately. Judge Hamilton looked at the comparative analysis and found that there were seven jurors who had given an equally equivocal response. Now, the Attorney General is disputing that. No, some of them weren't quite as equivocal. But the Attorney General very importantly concedes that these questionnaire responses for many of the seated jurors, six seated jurors, were less favorable to the death penalty than Mr. Thompson. And the State concedes that looking at the answer to this gray line question, there were several jurors who were at least as hesitant. And here's what the Attorney General says about all that. Well, the comparative suggestion is, yes, the comparative analysis looking at the substance of these statements, that might show that there were seated jurors who were less inclined to impose the death penalty than Mr. Thompson, if you look at the substance of the statements. But we can't gauge the intensity of the jurors' feelings in looking at a cold transcript. We can't tell. So the suggestion is, well, the prosecutor, despite the fact that the substance of the responses from the seated jurors shows that they are less inclined to impose the death penalty, we can disregard that because it may be that somehow in their gestures, somehow in matters that don't appear on this record, we can determine, oh, well, the State courts weren't unreasonable because maybe that's what the prosecutor relied on. Well, that point, and they cite Matthews v. Evitz for that. That's drawn from the Fourth Circuit Court of Appeals. That decision predates Millerel, and Millerel is quite clear that a comparative analysis requires us to look at and compare the substance of these statements. And in fact, the Fourth Circuit in the United States v. Barnett disapproved specifically the case that the attorney general has relied on there. This intensity approach is — it makes a mockery of the entire comparative juror exercise. So opposing counsel also points to places in the voir dire where these hesitant jurors were asked, well, could you impose a death penalty? And they said yes, as opposed to Mr. Thompson, who says I can obey the law of the land and makes that distinction. How should we take that? I think — I'm sure that Mr. Thompson said I can impose a death penalty if it's appropriate. But isn't there a major distinction between the willingness to impose the death penalty in the abstract versus imposing it in this particular case? And isn't that a distinction between some of the seated jurors and Mr. Thompson? Well, certainly there was no — there hasn't been any demonstration that there was a seated juror who was more emphatic in that regard than Mr. Thompson. There were a couple. There was Juror 10 who was strong in favor of the death penalty, and there were several — there were four or five other jurors who were moderately in favor, like Mr. Thompson. But I don't think that the questioning ever centered on or exposed Mr. Thompson's responses on that issue as being any — significantly any different than the other jurors. Counsel, would you like to speak about Ms. Gibson? Yes, Ms. Gibson. Very quickly, Your Honor. Ms. Gibson, as you've noted, Judge Hamilton found that as to Ms. Gibson, there were four apparently race-neutral — race-neutral reasons that apparently did not at first glance appear pretextual, but two that were. As to the — again, as to her answers on — well, as to her status as a school teacher, there's no question. She had been a substitute teacher for three years in the early 90s, whereas two of the selected jurors had been lifelong jurors. The prosecutor, interestingly, cited her status as a teacher as his second reason in justifying his strike, not so insignificant, and linked the status of — her status as a school teacher to the fact that she had been a substitute teacher for three years  And so, as to the question of whether or not Ms. Gibson had been a substitute teacher, that means fairly liberal. So I think the government said he was — he was going through the jury questionnaire and that was the order they came in, and it wasn't clear of the ranking. Is that wrong? Well, it could — I'll grant it. That could — that could be taken either way, Your Honor. It just doesn't — it doesn't suggest that he's minimizing the status as a school teacher. But there's no question that that — that the comparative analysis there weighs in favor of pretext. And in conjunction with that, or in addition to that, there is her — there are her remarks about her status as a Christian. Yes, when I was younger, I was — I was — when I was younger, I was opposed to the death penalty. Now I have come around to being in favor of the death penalty. The prosecutor's explanation was she said she's a Christian and that would affect her thinking. Well, in this instance, what — the way she said it would affect her thinking, and there's no — nothing in the record to suggest that she was being untruthful, was that she would be more inclined to vote for the death penalty. So that — this is a case that is like Alley v. Hickman, in which there is a juror who says, aha, that suggests and indicates that she's going to be against me. And in this instance, the substance of her remarks weighed in the other direction. Just like in Alley v. Hickman, there was a stricken juror, a black juror, who mentioned that she — her stepson had been the victim of child molestation, and she explained that this made her more sympathetic towards law enforcement. But the prosecutor nevertheless seized on her statement about molestation and said, well, this is going to incline her against me, against the prosecutor. And the — this Court said this simply can't be reconciled with the substance of what she said. Let me ask you about the — the Court found two reasons — the district court — two reasons pretextual and the others not. And we've held, I think, in Cook that even if you have only two valid reasons, that would be enough. So — so here, the district court found that four of the reasons were not pretextual. So what do we do with that? Well, as I understand, Cook, Your Honor, we're talking about it becomes a substantial factor test rather than a mixed motive analysis and what all that entails. But — so the issue for this Court is, really, regardless of the number of pretextual versus non-pretextual, was pretext a substantial factor? The importance attached, I would suggest, from the — to this response about her religion suggests that she gave — that the prosecutor gave it a great deal of weight. And when — actually, when Judge Hamilton, having looked at those two — two — which she thought were — correctly concluded were pretextual responses, moved to the remaining reasons, it gave her cause to question the prosecutor's reliance on her status as a defendant because she had never, in fact, practiced and that she had relatives who had been in the criminal justice system when, in fact, she said they had been treated fairly. So she balanced these factors, gave it — gave this as a second ground for — for the finding of pretext. Was this a sort of de novo review? That was one of my concerns about the district court. Rather than deferring to the State Appellate Court's determination, was the district court reviewing it de novo? If there's — if there — she was recognizing that she had to defer to the factual findings of the State Court where not unreasonable. And this kind of — this is almost a loop — a logical loop. But — but her — her — whether she was — to begin with, the State Appellate Court claimed to have done or purported to have done a comparative analysis. But it — there is absolutely no comparative analysis disclosed in the colloquy with — or in the State Court findings as to Thompson or as to Ms. Gibson. There just — it doesn't appear. But even if we could — could infer that it had been done or presume that it had been done, under Taylor, that comparative analysis is exposed as unreasonable, again, because the mischaracterization of the responses demonstrated to be so. And — and that's — that's a reason why it could not be credited. And also because the State Appellate Court, having assured — having purported that it was doing a comparative analysis, didn't — didn't examine the evidence that — that Judge Hamilton located in the colloquy with Johnson and with — with Gibson. So the — the conclusion of — Judge Hamilton's conclusion as to both these jurors was absolutely correct. She fully recognized what — what her obligation was under — under AEDPA. And again, I want to emphasize that the — the presence of pretext from one juror is enough to — to sustain a — a — an invalidation of the State result. I think Judge Hamilton closely followed the mandate of Kessler, of Alley, of Miller, L. She was aware of what those cases require and applied it fairly and accurately. Thank you, Mr. Horgan. Your time has expired. Thank you, Your Honor. Mr. Deist, you have some reserved time. Thank you, Your Honor. With respect to Mr. Thompson, when the trial judge asked him if he could accept the death penalty in the abstract, he responded, I guess you could say it's a gray-line answer there. I've always been taught to obey the laws of the land, and because this is the land that I live in, yes, I would have to, I guess, obey at that particular time. But I guess, yes, depending on the circumstances. Now, I tried to read that, quote, as neutrally as I could, but we have no idea if Mr. Thompson paused, if he grimaced, and if he did express — make physical gestures of that quote right there would have been sufficient to indicate reluctance. And additionally, I do emphasize the trial attorneys had been invited to comment, and when the prosecutor said repeatedly it was so obvious that Mr. Thompson couldn't impose the death penalty on non-shooters, and the trial court impliedly agreed, none of the defense attorneys said a word. On Ms. Gibson, the prosecutor did not misrepresent the record. It is true, she said, my born-again Christianity allows me to impose the death penalty. But the prosecutor did not say her religious beliefs would prevent her from imposing the death penalty. At excerpts of record 241 to 243, the prosecutor gave his reason, and he first said, Ms. Gibson said she initially opposed the death penalty, and then he said she also said she was a born-again Christian, and her Christian beliefs would influence the way she thinks. Now, it is true, she said, my Christian beliefs allow me to impose the death penalty. But step back. Again, the broader question, what does a prosecutor think when he hears a person is a born-again Christian? Even if you accept the death penalty in the abstract, might you be sympathetic to a young non-killer who perhaps has turned to Christ in jail? That's a legitimate concern. Thank you, Counsel. The case just argued will be submitted for decision, and the Court will take a brief recess.
judges: O'scannlain, Ikuta, Teilborg